UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

STEVEN W. OKKE,                                    Case No. DG 12-04035
                                                   Chapter 13
                    Debtor.                        Hon. Scott W. Dales
_____/


STEVEN W. OKKE,
                                                   Adv. Pro No. 13-80061
                    Plaintiff,

v.

NOLA J. OKKE,

                    Defendant.
_____/


OPINION AND ORDER AFTER TRIAL


          PRESENT:    HONORABLE SCOTT W. DALES
                      Chief United States Bankruptcy Judge


I. INTRODUCTION

        Steven W. Okke and Nola J. Okke were divorced on October 27, 2011, shortly before Mr.

Okke (the "Plaintiff" or "Mr. Okke") filed a voluntary petition for relief under chapter 13. The

ex-spouses continue to spar over the distribution of specified items of personal property that the

divorce court awarded to Mr. Okke but which were in the possession of Ms. Okke on the petition

date. On February 22, 2013, the court confirmed Mr. Okke's chapter 13 plan, premised to some

extent on a settlement that the ex-spouses put on the record, resolving many of the controversies

between the two. Nevertheless, the parties agreed to reserve decision on their competing rights in

the personal property, the possession of which Ms. Okke retained throughout most of this chapter

13 proceeding despite Mr. Okke's persistent demands. Eventually, Mr. Okke filed a complaint

against his ex-wife seeking turnover under § 542 and damages for violation of the automatic stay as contemplated in § 362(k). On motions for summary judgment, the court directed Ms. Okke to surrender the enumerated items, and from the parties' report at trial it appears she now has done so, except for a fish tank and fish which she sold post-petition. In directing turnover, however, the court expressly preserved Ms. Okke's security interest and perfection, if any, in the retained personal property notwithstanding her relinquishment of possession. The court set the remaining issues for trial to determine whether Ms. Okke's retention and sale of the property violated the automatic stay.

The court held the trial on the remaining automatic stay issues on June 5, 2014 in Grand Rapids, Michigan. At the trial, the court heard testimony from three witnesses including Mr. Okke, Ms. Okke, and Mr. Okke's divorce lawyer, Mr. Finegood. The court admitted 16 exhibits offered by the Plaintiff, and 8 documents from Ms. Okke, entirely on stipulation.

The court has considered the demeanor of the witnesses, their testimony, and the exhibits, and makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, applicable in this adversary proceeding under Fed. R. Bankr. P. 7052. For the following reasons, the court finds that Ms. Okke willfully violated the automatic stay and must respond in damages, including attorney fees, for her actions.

## II. JURISDICTION

The court has jurisdiction over the Plaintiff's chapter 13 bankruptcy case pursuant to 28 U.S.C. § 1334(a). The United States District Court has referred the bankruptcy case and related proceedings to the United States Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and LCivR. 83.2(a) (W.D. Mich.). Mr. Okke has consented to the court's entry of a final judgment although

Ms. Okke has not. The court finds, however, that the dispute is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E) and (K), rendering consent immaterial. Given the court's conclusions about the nature of the proceeding, the Supreme Court's recent decision regarding "*Stern* claims" does not affect the court's authority. *See Executive Benefits Ins. Agency v. Arkinson*, __ U.S. __, ___, 134 S.Ct. 2165, 2173 (2014).

## III. <u>ANALYSIS</u>

A. <u>Background</u>

During the divorce proceedings and at the time the Plaintiff commenced his bankruptcy proceeding, the parties owned stock and membership interests in two entities which together owned the real estate and other assets necessary to operate a convenience store in Morley, Michigan. For reasons not relevant to today's ruling, the store fell on hard times as the relationship between the spouses deteriorated. Because of their joint operation of the store, both parties evidently shared not only personal debt but also business debt which they attempted to allocate among themselves pursuant to a certain Confidential Property Settlement Agreement (the "CPSA") which the court admitted as Exhibits 2 and A, and the judgment of divorce dated October 27, 2011 (the "JOD"), admitted as Exhibits 1 and B.

At the time of the divorce proceedings, Mr. Okke intended that the companies (Okke's, Inc., and Sono's, LLC) would obtain sufficient refinancing to pay not only the business debts but the share of the joint personal debts he agreed to shoulder. Unfortunately, the financing for the businesses fell through and Mr. Okke was unable to satisfy the debts he agreed to assume in the divorce proceedings.

On April 26, 2012, he filed a voluntary petition for relief under chapter 13. As noted above, the court confirmed his chapter 13 plan on February 22, 2013, reserving the issues involving the personal property for separate trial.

The court finds without difficulty and without contradiction that Ms. Okke was aware of the bankruptcy proceedings and the automatic stay at all relevant times. Indeed, the correspondence to her counsel highlights the automatic stay and the consequences of ignoring it. Even after Mr. Okke filed his complaint in this matter, Ms. Okke retained possession of various tools, a certain fish tank, and exotic fish evidentially as leverage to induce Mr. Okke to honor his obligations to her under the JOD, even though that personal property was awarded to him. In fact, Ms. Okke did not relinquish possession of the tools until after this court entered an order partially granting Mr. Okke's summary judgment motion.

At trial Ms. Okke explained that she retained possession to secure her ex-husband's performance, and she did so in spite of the bankruptcy. In addition, she testified that rather than return the fish tank and fish as Mr. Okke demanded through counsel, she sold the tank and fish, post-petition, to her boyfriend's brother for $500.00.

Her anxiety about her ex-husband's ability to honor his obligations under the JOD and the CPSA is perfectly understandable, given her experience following the divorce. For example, evidently as a result of his inability to pay the parties' home mortgage as agreed, the bank foreclosed, requiring Ms. Okke to move out of her residence. Similarly, although he agreed to pay a debt secured by a lakefront lot across the street from the house, that property, too, is at risk of foreclosure.

As legal justification for her continued possession, Ms. Okke insists that the CPSA creates a security interest under Article 9 of the Uniform Commercial Code. She argues that she

retained possession of the tools, tank, and fish to maintain perfection of that security interest pursuant to M.C.L. § 440.9313(1) which states that a secured party may perfect a security interest in goods by possession.[1]  Therefore, § 362(b)(3), she contends, authorizes her to take steps to continue her perfection (*i.e.,* by remaining in possession) without violating the automatic stay.

B. Motion at Close of Plaintiff's Proofs

At the close of Mr. Okke's case, Ms. Okke orally moved for judgment on partial findings. Fed. R. Civ. P. 52(c). The court deferred decision on that motion until the close of all evidence.

The gist of the motion is that Mr. Okke did not list on his schedules the fish and fish tank, and that his purported exemption in the tools is ineffective because the tools were not "tools of the trade" at the time he filed his petition. Mr. Okke was a shopkeeper at that time, not a mechanic that he later became when the store closed.

The court has determined to deny the motion for two reasons. First, to the extent Ms. Okke attacks Mr. Okke's exemption claim in the tools, the court regards the challenge as untimely.  Fed. R. Bankr. P. 4003(b)(1); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643 (1992). Second, because a chapter 13 debtor is entitled to use estate property irrespective of any exemption claim, the court concludes that Ms. Okke's retention of estate property injured Mr. Okke as an individual debtor, albeit one with a statutory right to use property of the estate. If this case had been a chapter 7 case and the property at issue remained "property of the estate" because of defective or unclaimed exemptions, the court's ruling might be different because a chapter 7 debtor, unlike a chapter 13 debtor, is not a debtor in possession and is not authorized to

---

[1] Applicable law did not require her to maintain perfection by possession, because filing a financing statement is an alternative method of perfecting a security interest in goods. M.C.L. § 440.9310(1). Possession, however, gets a debtor's attention in a way that filing a financing statement cannot.

use estate property. *Compare* 11 U.S.C. § 521(a)(4) with *Id.* §§ 1303, 1304 & 1306(b). So, irrespective of whether the tools, fish tank, or fish were properly scheduled or exempted, they are clearly property of the estate, which Mr. Okke as a chapter 13 debtor may possess and use in accordance with statutory authority. Ms. Okke's interference with Mr. Okke's right to possess, use, and otherwise enjoy this property injured him as an individual.[2] For this reason, despite the challenge Ms. Okke mounted in her defense based on Mr. Okke's schedules, the court denies the motion for judgment on partial findings.

C. Security Interest

Ms. Okke's defense to Mr. Okke's charge that she willfully violated the automatic stay, therefore, hinges on the court's finding that the CPSA created a security interest. It did not.

The provision of the CPSA that took on particular significance during the trial purportedly transferred title to the disputed property in Mr. Okke free and clear of liens and other interests, yet contemplated enforcement against that property pursuant to the JOD. The crucial provision is set forth in full:

> Any and all personal property already in the possession of each of the parties hereto shall, save as indicated and excepted herein below, remain as their respective sole and separate property free and clear from any claim of right, title and/or interest the other had, has or may have of whatsoever nature, excepting enforcement of provisions set forth in this Judgment of Divorce [sic].

*See* Exhibit A (CPSA at II.D.2, pp. 6-7). The spouses interpret this provision in different ways, at least in respect to its impact on the automatic stay.

---

[2] At the risk of oversimplifying the elaborate and elegant provisions of the Bankruptcy Code, the "deal" in a chapter 13 case is rather different from the "deal" in a chapter 7 case. A chapter 13 debtor retains possession and use of estate property, but surrenders a portion of post-petition wages or other income to satisfy debts; a chapter 7 debtor, in contrast, surrenders estate property, but retains postpetition wages. *In re Grice*, 319 B.R. 141, 145 (Bankr. E.D. Mich. 2004). This difference has many implications in the case of an individual debtor, including for purposes of § 362(k).

For his part, Mr. Okke contends that this provision vested title to the property in him entirely without any qualification. He explained that the language "excepting enforcement of provisions" etc., merely recognizes Ms. Okke's right to return to the divorce court to adjust spousal support in case Mr. Okke did not honor some or all of his obligations to her. Indeed, the parties, in fact, did return to the divorce court, which announced its intention to direct the sale of Mr. Okke's personal property to satisfy his obligations to his ex-wife. Before the divorce court could enter an order effectuating its oral ruling, however, Mr. Okke filed this chapter 13 proceeding staying the state court's hand.

Ms. Okke, in contrast, contends that the same paragraph granted her a security interest to secure her ex-husband's obligations under the JOD and CPSA. She notes that the enforcement language follows immediately after the vesting language within the crucial paragraph, indicating by proximity and text an intention to subject the personal property to a continuing interest in her.

For several reasons, the court finds that the CPSA does not create a security interest in the property which Ms. Okke continued to possess. First, as a textual matter, the provision states only that property "already in the possession of each of the parties" shall "*remain* as their respective sole and separate property . . ." CPSA at II.D.2, pp. 6-7 (emphasis added). Strictly speaking, the "excepting" clause upon which Ms. Okke relies to create a security interest applies only to property already in Mr. Okke's possession. The property at issue in this adversary proceeding was property awarded to Mr. Okke but that remained in *Ms. Okke's* possession.

Second, Article 9 of the Uniform Commercial Code, with exceptions not relevant here, applies to any "transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." M.C.L. § 440.9109(1)(a). A "security interest," in turn, "means an interest in personal property or fixtures which secures payment or performance of an

obligation. *Id*. 440.1201(2)(ii). Under the "scope" provision of the predecessor to Revised Article 9, the Michigan Court of Appeals observed that "[t]he intent of the parties to an agreement concerning an interest in property determines whether the agreement transfers ownership of the property or whether the parties merely intended the property to secure performance of an obligation." *Prime Financial Services v. Vinton*, 761 N.W.2d 694, 706 (Mich. Ct. App. 2008). Although the current scope provision no longer refers to transactions "intended" as security, *see* M.C.L. § 440.9109, the reference to "contract" within the current provision sufficiently imports the concept of intent, continuing its centrality in deciding whether parties created a security interest.

As the *Vinton* court noted, if the document is unambiguous, a court looks to the four corners. *Vinton*, 761 N.W.2d at 706. Otherwise, as with other ambiguous contracts, the court may consider parol evidence. *Klapp v. United Insurance Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003).

Here, the parties both offered parol evidence (without objection on that ground) in the form of testimony from Mr. Okke's lawyer, Ms. Okke herself, and the Proof of Claim she filed in this case. Mr. Finegood, who credibly testified that he was involved in negotiating the CPSA, stated that it is his practice in divorce cases to specifically use the word "lien" if the parties intended to create some type of security arrangement in a consent decree or property settlement agreement. The court infers from his testimony that the parties did not intend to create security in the CPSA, but instead intended to enforce their respective obligations in the divorce court by, for example, seeking to adjust the support award. Although no magic words are necessary to create a security interest, the testimony of Mr. Okke's lawyer is a window on the parties' intent.

Ms. Okke testified that she included the "excepting enforcement of provisions" language because she was insecure, which tends to show a motivation in favor of creating a security interest, but the motivation falls short of creating such an interest. Significantly, in her Proof of Claim, she omits any reference to any security, instead characterizing her claim as "priority" and unsecured. While it is true that a secured creditor need not file a proof of claim, one who does file such proof and who does not claim security runs the risk of losing that security,[3] or, as here, having a court find that she did not have collateral in the first place.

Although the JOD includes enforcement provisions, it does not expressly recognize any lien or security interest in either party's favor. Ms. Okke did not argue at trial that she enjoyed a lien under M.C.L. § 552.27 or similar statute,[4] but even if she had, the provisions of Article 9, authorizing a secured party to perfect a security interest in goods by possession,[5] would probably not affect a statutory spousal support lien: Article 9 does not apply where "[a]nother statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state." M.C.L. § 440.9109(3)(b).

Based on the testimony of the witnesses, the language of the CPSA, the JOD, and Ms. Okke's Proof of Claim, the court finds by a preponderance of the evidence that Ms. Okke did not have a security interest in her ex-husband's personal property.

Moreover, even if § 362(b)(3) authorized Ms. Okke to maintain perfection, it most certainly did not authorize her to enforce her supposed security interest by selling the fish tank and fish, and doing so without observing the requirements of Article 9's enforcement provisions.

---

[3] *In re Bailey*, 664 F.3d 1026, 1029 (6th Cir. 2011).

[4] The Legislature provided limited means for enforcing a lien for spousal support, each involving a role for the divorce court or other government agency. *See, e.g.,* M.C.L. §§ 552.27 & 552.625a. It is not surprising, given the acrimony in this setting, that the self-help and other party-directed perfection and enforcement mechanisms that characterize Article 9 are generally not included in the statutes governing support liens.

[5] M.C.L. § 440.9313(1) (secured party may perfect security interest in goods by possession).

Her behavior in connection with this case and the property of the estate was marked by flagrant and desperate lawlessness, utterly inconsistent with Mr. Okke's rights as a chapter 13 debtor. Perhaps worse, it also threatened to harm creditors by jeopardizing the success of his chapter 13 plan. The automatic stay does not simply benefit the debtor; it protects the estate and other creditors by fostering the orderly distribution of property of the estate according to a statutory formula.

In view of the court's conclusion that Ms. Okke did not enjoy a security interest, the exception to the automatic stay upon which she relies —§ 362(b)(3)— provides no defense to Mr. Okke's claim for damages.


D. <u>Damages</u>

Mr. Okke seeks compensation for his ex-wife's violation of the automatic stay, relying on § 362(k), which provides in relevant part as follows:

> . . . an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k). As noted above, if any creditor has ever willfully violated the automatic stay, Ms. Okke did. On numerous occasions, Mr. Okke, his counsel, the court, and probably even Ms. Okke's eminently capable counsel, advised her of the bankruptcy petition, the automatic stay, and its effect on creditor action including the retention of estate property to secure advantage over the Plaintiff and other creditors. Although the court admires the creativity in counsel's argument about the supposed creation of a security interest under the CPSA, the court infers from the testimony that the supposed security interest was a *post hoc* invention, ultimately unsupported by the testimonial and documentary evidence. Even if Ms. Okke believed in good

faith that she enjoyed the right to possess the tools, the fish tank, and the fish, her mistaken belief does not preclude the court's finding of willfulness. *In re Thompson*, 426 B.R. 759, 764 (Bankr N.D. Ill. 2010) ("Not even a good faith mistake of law or a legitimate dispute as to the legal rights relieve a willful violator of the consequences of his act."). Upon a finding of a willful violation, the statute mandates compensatory relief, including attorneys fees. 11 U.S.C. § 362(k)(1) (injured individual "shall recover actual damages"). Unfortunately for Mr. Okke, the presentation on the damage element of his case was not nearly as strong as the other elements of his case.

First and foremost, Mr. Okke's testimony was not especially credible. Although he endeavored to persuade the court that the tools, which he valued in the schedules at $4,000.00, all belonged to him, on skillful cross-examination by Ms. Okke's counsel, he conceded that many of the items belonged to either the convenience store companies, or were not in fact tools he would use "at the shop" and therefore not "tools of the trade." He provided no persuasive evidence of value, and regardless, the record established that Ms. Okke returned them, albeit reluctantly and pursuant to court order. There was no testimony or even suggestion that his tools lost any value while Ms. Okke retained possession. He did, however, testify credibly that her refusal to return the tools forced him to purchase others through his new employer so that he could earn a living as an automobile mechanic after the convenience store failed.

Because Ms. Okke eventually returned the tools she had been wrongfully retaining, she deprived him only of their use for a period of time, not their entire value. Moreover, although Mr. Okke concededly had a duty to mitigate damages, he offered no testimony along these lines, other than the fact that he purchased unspecified replacement tools, on credit from his current employer. Awarding him the full cost he incurred in acquiring the new tools would over-

compensate him, particularly given that Ms. Okke has at long last returned the original set. If the court were to require Ms. Okke to pay the full cost of the replacement tools, assuming Mr. Okke used the funds to pay his employer for the new tools, he would have two sets of tools, free and clear. Under the circumstances, the court finds that the rental value of the old tools rather than the replacement cost of the new would be the most accurate measure of his damages for the deprivation, but Mr. Okke offered no persuasive evidence of this value.

On this record, the court is left to speculate about Mr. Okke's actual damages resulting from Ms. Okke's retention of possession. Consequently, having not proven the damage element in this part of his case, the court awards him nothing for the tools.

The other property items at issue during the trial —the fish tank and fish— present a slightly easier case on damages, although the parties' testimony was conflicting. Unlike the tools, which she eventually returned, Ms. Okke permanently deprived Mr. Okke of the enjoyment of the fish tank and the fish by selling them to her boyfriend's brother for $500.00. She contends that the sale price was fair, in part because a buyer paid this for the property, and in part because unnamed and non-testifying individuals at two pet stores indicated she would do well to sell the property for that price.[6]

Mr. Okke endeavored to persuade the court that the fish tank together with the exotic fish was worth approximately $7,000.00. The court notes, however, that he omitted any reference to the fish tank and fish from Schedule B, which he declared to be accurate under penalty of perjury. Viewing the omission charitably, the court could perhaps determine that when he filed

---

[6] Although the court admitted the hearsay testimony without objection, the court is not relying on this evidence in reaching its opinion on damages. *Compare* Fed. R. Evid. 103(a)(1) (preserving claim of error) with Fed. R. Evid. 802 (hearsay not admissible).

the schedules he felt that the property was of immaterial value.[7] On cross-examination, Mr. Okke conceded that he bought the tank, used, in a private sale, for $2,000.00, three years before the divorce in 2008. Trial Tr. p. 52:23-25

Ms. Okke's recollection seemed crisper than her ex-husband's. She agreed that the couple bought the tank "used," but she testified they bought it at a garage sale for $200.00. As for the fish, rather than the $100.00 per fish price that Mr. Okke suggested in his testimony, Ms. Okke testified, without contradiction, that the couple belonged to a "fish club." She testified that she recalls purchasing the fish for a fraction of that price, in some cases for less than twenty-five cents per fish. Trial Tr. p. 80:13-20.

The court credits Ms. Okke's testimony of the value of the fish tank and the fish, and finds that both were worth the $500.00 that her boyfriend's brother was willing to pay. Therefore, the court will award Mr. Okke damages of $500.00 for the fish tank and fish.

The larger component of damages, however, required as a matter of statute, are the fees that Mr. Okke incurred in response to Ms. Okke's flagrant stay violations, first in retaining the property without authority, and second, in selling the fish tank and fish post-petition. The Plaintiff testified, without contradiction, that he incurred at least $9,000.00 in fees as a result of Ms. Okke's willful stay violation. The amount is admittedly high,[8] if not outright shocking considering the value and subject matter of the dispute, but Ms. Okke's flouting of the stay throughout most of this case is equally shocking. She ignored her obligations under the Bankruptcy Code at her peril.

---

[7] Immateriality of value may explain, but not excuse, an omission of assets from a debtor's schedules. *See* 11 U.S.C. § 521(a)(1)(B).
[8] The statute requires an award of "*actual* damages, including costs and attorneys' fees . . . ." 11 U.S.C. § 362(k).

Consequently, the court finds, by a preponderance of the evidence, that Mr. Okke's actual damages were $9,500.00, representing $500.00 for the fish tank and fish, and $9,000.00 for actual attorneys' fees.

## IV. <u>CONCLUSION & ORDER</u>

The court does not reach this decision lightly, and hesitates to compound the injuries that Ms. Okke has obviously suffered as a result of Mr. Okke's inability or unwillingness to honor his obligations to her under the CPSA and the JOD. The court, however, cannot ignore Ms. Okke's stubborn and ill-considered refusal to relinquish the property of the estate that her ex-husband, as a chapter 13 debtor, was entitled to use in connection with (i) the fresh start that Congress offers through the Bankruptcy Code, and (ii) the distribution to his other creditors based on the fruits of his labors, particularly with respect to the tools. For this reason, and based on the evidence adduced at trial, the court will enter judgment on a separate document requiring her to pay him $9,500.00, plus costs. *See* Fed. R. Civ. P. 58(c) (separate document); Fed. R. Bankr. P. 7054(b) (costs).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter a judgment on a separate document conforming to the court's decision to award $9,500.00 to the Plaintiff.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order After Trial pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Steven W. Okke, William J. Napieralski, Esq., Nola J. Okke, Perry G. Pastula, Esq., and the United States Trustee.

**IT IS SO ORDERED.**

**Dated July 17, 2014**



Scott W. Dales
United States Bankruptcy Judge